D. Maimon Kirschenbaum
Michael DiGiulio
JOSEPH & KIRSCHENBAUM LLP
32 Broadway, Suite 601
New York, NY 10004
(212) 688-5640
(212) 688-2548 (fax)

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------**x**

**GOL OPHIR,**

    **Plaintiff,**

  **v.**

**KONEKSA HEALTH INC, and CHRIS**
**BENKO,**

    **Defendant.**

----------------------------------------------------------**x**

**INDEX No.:**

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

   Plaintiff Gol Ophir alleges as follows:

   1.  Plaintiff Gol Ophir was the General Counsel for Defendant Koneksa Health Inc. before the Chief Executive Officer, Defendant Chris Benko unlawfully fired him in retaliation for reporting potentially illegal behavior – sexual harassment and battery – involving the President and Chief Operating Officer of the Company. That is, Mr. Ophir became aware that a senior executive was drugged during an off-site leadership retreat by an unnamed Koneksa executive and that the President of the Company witnessed the incident and at the very least allowed it to occur. Mr. Ophir, as the General Counsel, took the necessary steps to protect the Company and its employees, and to begin the process of investigating the situation. However, when Mr. Ophir notified the CEO Defendant Chris Benko of the incident, Mr. Benko became visibly hostile and

aggressive towards Mr. Ophir, shouting and yelling at him and instructing him to "drop it." Mr. Ophir refused, and Defendant Benko retaliated by firing him two weeks later.

2.      In addition, for most of his employment, Mr. Ophir was the oldest member of the Company's executive team and the second oldest employee in the Company, and throughout his employment Defendants paid him less than other similarly situated younger employees because of his age. Defendants gave Mr. Ophir fewer equity grants, lower cash bonuses, and a lower base salary because of his age. Defendants were aware of these discriminatory pay disparities but continued to underpay Mr. Ophir in spite of the fact that it violated the Company's own internal policies about fair and equitable pay.

3.      Defendants intentionally and maliciously underpaid Mr. Ophir because of his age and retaliated against him by terminating his employment because he complained about sexual harassment and battery involving the Company's President and Chief Operating Officer and other senior executives of Koneksa. This is wrong and illegal.

## JURISDICTION AND VENUE

4.      Plaintiff brings this action against Defendants alleging discrimination and retaliation claims brough under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623; the New York Labor Law ("NYLL"), N.Y. Lab. Law §§ 194, 740; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 269; and the New York City Human Rights Law ("NYCHRL"); N.Y.C. Admin. Code § 8-107 et seq.

5.      This Court has original federal question jurisdiction under 28 U.S.C. § 1331 because the case is brought under the ADEA. This Court has supplemental jurisdiction over the New York state law claims, as they are so related to the claims in this action within the Court's

original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

6.      On August 17, 2023, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") against Defendants for discrimination based on age. This Court has jurisdiction over Plaintiff's ADEA claim because Plaintiff files this claim in this Court after 60 days from the date of his EEOC filing and within 90 days of receiving a right to sue letter as required by 29 U.S.C. § 626(d), (e).

7.      Venue is proper in this District under 28 U.S.C. § 1391 because Defendants conduct business in this District, and the acts and/or omissions giving rise to the claims herein allegedly took place in this District.

## PARTIES

8.      Defendant Koneksa Health Inc., ("Koneksa" or the "Company") is a Delaware corporation that sells healthcare software with its headquarters and principal place of business located at One World Trade Center, 285 Fulton St. 77th Floor, New York, NY 10007.

9.      Defendant Chris Benko ("Benko") is the Chief Executive Officer of Koneksa and Plaintiff Gol Ophir's direct supervisor.

10.     Plaintiff Gol Ophir ("Mr. Ophir" or "Plaintiff") is a 56-year-old man who worked for Defendants as Koneksa's General Counsel, Head of Corporate Development and Partnerships, and Chief Risk Officer from December 3, 2018 through August 15, 2023.

## FACTS

11.     Defendant Koneksa is a tech company that designs and sells biotech software and services for pharmaceutical companies that conduct clinical trials.

12.     Defendant Koneksa has approximately 100 employees.

13.     Mr. Ophir began working for Defendant Koneksa as their General Counsel and Head of Corporate Development and Partnerships in December 2018.

14.     Throughout Mr. Ophir's almost five years of employment with Defendants, Mr. Ophir was a strong performer, consistently met and exceeded expectations with respect to all deliverables across all his roles and responsibilities and received positive feedback and accolades.

### Defendants Paid Mr. Ophir Less Because of His Age

15.     Mr. Ophir is currently 56 years old. He was 51 years old when he was hired.

16.     When he was hired, Mr. Ophir was the oldest member of Koneksa's Executive Leadership Team.

17.     During most of his tenure working for Defendants, Mr. Ophir was the second oldest employee working for Koneksa and the oldest member of Koneksa's Executive Leadership Team.

18.     Defendant Benko made the decision to hire Mr. Ophir and set Mr. Ophir's pay.

19.     Mr. Ophir was paid less than other similarly situated younger executives, and he was paid less because of his older age.

20.     In negotiating Mr. Ophir's compensation package, Defendant Benko offered Mr. Ophir a compensation package that included a base salary, equity grants, and cash bonuses.

21.     Defendant Benko told Mr. Ophir that all of Defendants' top executives that were employed at the same level of Mr. Ophir (i.e., the Executive Leadership Team) are all treated the same and received the same base-level salary. However, this quickly ceased to be true. Based on Defendant Benko's misrepresentation that all ELT members would be paid the same, Mr. Ophir accepted a base salary that was significantly lower than he had received previously.

22.     During extended periods of time during his tenure Mr. Ophir was the oldest member of the Executive Leadership Team ("ELT"), which consists of 9 individual executives.

23.    At times during his employment, at least five members of the executive leadership team – the Chief Medical Officer, the Executive Vice President of Finance, the Chief People Officer, the Chief Executive Officer, and the President – received a base salary higher than Mr. Ophir.

24.    While Mr. Ophir's base salary had minor annual increases during his tenure with Koneksa, Defendant Benko began paying Mr. Ophir less than his peers within a few months of his employment.

25.    Defendants routinely increased the total compensation of other Executive Team members more than Mr. Ophir and hired new Executive Team members with higher base salaries and total compensations than Mr. Ophir in violation of Koneksa's stated compensation policies.

26.    For example, Defendants gave extra grants of equity to other members of the Executive Team, including the President and Chief Operating Officer, the VP of Finance, and the VP of People.

27.    Mr. Ophir never received an additional equity grant during his entire employment with Defendants.

28.    Upon information and belief, Defendants gave significantly larger cash bonuses to other employees, even when these members failed to meet performance standards, including when these case bonuses were contractually contingent on meeting performance standards.

29.    For example, the Head of Data Science received a significantly larger cash bonus for 'retention' purposes even though there was no risk of departure. This person is a co-founder of Koneksa and the largest individual shareholder of the company. This person is younger than Mr. Ophir.

30.     The Head of Data Science was part of the Executive Team along with Mr. Ophir. The Head of Data Science position required equal levels of skills, duties, and responsibilities as Mr. Ophir's Head of Corporate Development and Partnership, General Counsel, and Chief Risk Officer positions.

31.     As another example, Defendants gave a sales representative an advance on their cash bonus despite making no sales at all, but the Defendants did not require this sales representative to pay back the bonus even though they did not meet the sales goals required to receive this bonus. These sales representatives were younger than Mr. Ophir.

32.     In addition, Defendants gave equity grants to other employees, even when these members failed to meet performance standards, and even when these grants were contractually contingent on meeting performance standards.

33.     For example, Adam Butler, the Head of Business Development was vested with equity grants despite failing to meet the sales targets his employment agreements required for vesting to occur. Mr. Butler is younger than Mr. Ophir.

34.     The Head of Business Development position required equal levels of skills, duties, and responsibilities as the Head of Corporate Development and Partnership, General Counsel, and Chief Risk Officer positions.

35.     Defendants claim to maintain a policy to ensure that their employees are paid fairly and within industry standards.

36.     To implement this policy, Defendants commissioned annual reports from Aon-Radford ("Radford") that identifies, within Koneksa's industry, the range of base salaries and compensation for all of the roles and positions of Koneksa's employees.

37.     Separate from Defendant Benko's stated policy to pay all executives equally, Defendants maintain a policy that aimed to pay all of Defendants' employees at the 50th percentile, with the minimum pay at the 25th percentile, for their respective roles per the Radford reports. The vast majority of Defendants' employees were paid near the 50th percentile for their respective role.

38.     In late 2022, Defendants hired Renee Kasper as the Chief People Officer.

39.     In early 2023, after reviewing the Executive Team's compensation packages, Ms. Kasper told Mr. Ophir that he was being underpaid compared to his peers on the Executive Team.

40.     Specifically, Ms. Kasper told Mr. Ophir that his base salary was well below the 25th percentile from the Radford report and implied that it was close to the 10th percentile.  Ms. Kasper told Mr. Ophir that he was the only member of the Executive Team that was paid below Koneksa's stated policies.

41.     Ms. Kasper said she was shocked at how low Mr. Ophir's base salary was compared with the rest of the Executive Team, including compared with her own salary, and compared to peers in the industry.

42.     For much of his employment, the only employee at Koneksa older than Mr. Ophir was Rick Griffin, the Vice President of Dev Ops and Corporate IT. Mr. Griffin is in his early 60's. Mr. Griffin is a member of the Senior Leadership Team, which is one level below the Executive Team.

43.     Ms. Kasper further told Mr. Ophir that Mr. Griffin's base salary was also well below the 25th percentile from the Radford report.

44.     That is, the Chief People Officer confirmed that two of Defendants' oldest employees were being underpaid compared with the rest of the company's employees and compared to the industry standard.

45.     Moreover, these underpayments violated Defendants' company-wide policy to maintain base salaries at or above the 25th percentile as stated in the Radford reports.

46.     Ms. Kasper spoke with Defendant Benko about getting Mr. Ophir's and Mr. Griffin's base salaries raised to a comparable level to their co-workers and peers, and to conform with the company policy.

47.     Confronted with this direct information about Mr. Ophir's pay disparity, Defendant Benko refused to raise Mr. Ophir's base salary, and Mr. Ophir's compensation remained the same for the remainder of his employment.

48.     Simply put, Defendants paid Mr. Ophir less – he received a lower base salary, was given less equity grants, and was given smaller bonuses – because of his age and did so in violation of Defendants' own pay policies. This is discriminatory and illegal.

### Defendant Benko Retaliated Against Mr. Ophir

49.     Throughout Mr. Ophir's tenure as General Counsel, Head of Corporate Development and Partnerships, and Chief Risk Officer, he attempted to standardize Koneksa's policies and procedures.

50.     Specifically, Mr. Ophir tried to implement best practices in order to clarify all employee's roles and responsibilities and workflows and to formalize the process by which the Company reviews its strategies, tactics, and policies such that the Executive Team could hold each other accountable, learn from past mistakes, and make better decisions in the future.

51.     Because of his insistence on accountability, Mr. Ophir had many disagreements with Vik Shah, Koneksa's President and Chief Operating Officer, about management styles, follow through, and strategy.

52.    For example, Mr. Shah routinely set sales and contractual goals for himself and for his team. However, when Mr. Shah failed to meet these goals, time and time again, Mr. Ophir was one of the few, if only, Executive Team members who challenged Mr. Shah – suggesting that Mr. Shah change tactics or strategy or to formalize a review process in order to evaluate what needed to be done, in order to meet the corporate goals.

53.    Mr. Ophir's critiques and suggestions were ignored, and Mr. Shah continued to fail to meet set goals without any change or accountability from the Executive Leadership Team.

54.    Mr. Ophir's analysis of Mr. Shah's mismanagement was sound. Mr. Shah failed to follow through on projects and the Company has failed to hit its sales goals for many quarters. Defendants begrudgingly recognized that Mr. Ophir was correct in seeking accountability from the Executive Leadership Team but refused to agree to conduct the necessary assessments.

55.    In June 2023, Renee Kasper, the Chief People Officer, told Mr. Ophir a disturbing story about a social work event following a Senior Leadership Team offsite a couple of weeks earlier.

56.    Specifically, Ms. Kasper told Mr. Ophir that she does not drink alcohol, but that at this social work event someone had spiked her drink with alcohol when she was not looking and that, as a result, she got really drunk.

57.    Ms. Kasper told Mr. Ophir that Vik Shah, the President and Chief Operating Officer of Koneksa, was present during the event and saw who spiked her drink, along with several other senior managers, and let it occur. Ms. Kasper told Mr. Ophir that no one, including Mr. Shah, warned her about her spiked drink and allowed her to drink it without knowing about the extra alcohol.

58.   Mr. Ophir was seriously concerned about what happened to Ms. Kasper and, as Koneska's General Counsel, about the Company's potential liability.

59.   Mr. Ophir was concerned that the liability for the company could be very serious because the President of Koneksa had witnessed (and potentially participated in) the drugging of a high-level female employee.

60.   Mr. Ophir recommended that Ms. Kasper make a formal complaint about the incident so that the company could investigate what happened.

61.   Ms. Kasper was reluctant to move forward with formal complaint because she has "to work with these people" and did not want to cause any trouble.

62.   Nevertheless, Mr. Ophir, as Koneksa's General Counsel, understood that the Company (and potentially Mr. Shah) could be exposed to liability because of the incident.

63.   Thus, Mr. Ophir sought legal advice from the Company's outside counsel that had been retained to handle all human resource issues.

64.   The Company's lawyers produced a detailed memo recommending that, despite Ms. Kasper's reluctance to make a formal complaint, the Company conduct a formal investigation of the incident because of the serious potential for liability for, among other things, sexual harassment, and battery.

65.   This was particularly true because Mr. Shah, the Company's President, was present at, and a witness to, the incident.

66.   In his next one on one meeting with Defendant Benko, which occurred in July 2023, Mr. Ophir informed Defendant Benko about the incident with Ms. Kasper, her illegally spiked drink and Mr. Shah's failure to protect her.

67.     Defendant Benko reacted to Mr. Ophir's story about Ms. Kasper's spiked drink with great hostility and rage.

68.     Defendant Benko yelled and shouted at Mr. Ophir and accused him of using the incident to deflect from issues with his work (there were no legitimate issues with Mr. Ophir's work).

69.     Defendant Benko instructed Mr. Ophir to drop it and kept insisting that the incident was not a big deal and that Mr. Ophir's involvement in gathering information about it should stop.

70.     Mr. Ophir calmly informed Defendant Benko that the incident needed to be taken seriously because he believed it was illegal, it put company employees in danger, it was likely to be understood as sexual harassment and/or battery that could be interpreted as condoned behavior by Koneksa management, as it involved the Company's President, Mr. Shah.

71.     Mr. Ophir further informed Defendant Benko that he had already sought outside counsel's advice on how to proceed in order to protect the Company and its employees.

72.     Defendant Benko was angry that Mr. Ophir involved outside counsel at all.

73.     Mr. Ophir informed Defendant Benko that outside counsel had recommended that the Company conduct a formal investigation of the incident, and that to not investigate it would leave the Company and Senior Executives open to more serious liability.

74.     Mr. Ophir told Defendant Benko that this was particularly true because Mr. Shah, the President of the Company, was a witness and, potentially a participant in, the incident.

75.     Defendant Benko did not want to hear this advice and shut down the conversation with Mr. Ophir.

76.     After the meeting, Mr. Ophir sent Defendant Benko the memo with outside counsel's recommendation, and formally recommended that the Company investigate the incident.

77.     Approximately two weeks later, on August 1, 2023, in Mr. Ophir's next one on one meeting with Defendant Benko, Defendant Benko terminated Mr. Ophir's employment.

78.     Defendant Benko merely told Mr. Ophir that his "time was up" at the company, and that he could either resign or he would be terminated.

79.     Mr. Ophir refused to resign, and Defendant Benko fired him.

80.     Defendants retaliated against Mr. Ophir for complaining about the potential sexual harassment and battery of a senior executive employee and about Mr. Shah's participation in the illegal incident.

81.     Further, up until Plaintiff's complaint about the incident, Defendants knew that Mr. Ophir was correct in his critique of Mr. Shah's mismanagement and failure to meet sales and other goals and standards, but Defendants simply failed to address these business issues. However, now that Mr. Ophir raised legitimate concerns that Mr. Shah had participated in the illegal drugging of an employee – jeopardizing Mr. Shah's continued leadership at the Company – Defendants determined that Mr. Ophir's "time was up" and terminated him. This was an unlawful retaliation.

**FIRST CLAIM FOR RELIEF**
**Age Discrimination in Employment Act ("ADEA")**
**29  U.S.C. § 631, et seq. – Age Discrimination**

82.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

83.     In violation of the ADEA, Defendants intentionally and willfully paid Plaintiff less compensation because of his age.

84.     Defendants' conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily protected civil rights.

85.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including past salary, bonuses, and equity opportunities.

86.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to emotional distress, lasting embarrassment, and humiliation.

87.     As a result of Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages, liquidated damages, punitive damages, attorneys' fees and costs, pre/post judgment interest, and such other legal and equitable relief as this Court deems just and proper

## SECOND CLAIM FOR RELIEF
### New York Labor Law ("NYLL") § 194 – Equal Pay

88.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

89.     In violation of the NYLL, Defendants intentionally and willfully paid Plaintiff less total compensation than other similarly situated employees whose work required equal skill, effort and responsibility to Plaintiff or doing substantially similar work, when viewed as a composite of skill, effort, and responsibility, to Plaintiff.

90.     Defendants intentionally and willfully paid Plaintiff less compensation than these other similarly situated employees because of Plaintiff's age.

91.     Defendants' conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily protected civil rights.

92.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including past salary, bonuses, and equity opportunities.

93.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to emotional distress, lasting embarrassment, and humiliation.

94.     As a result of Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages, liquidated damages, punitive damages, attorneys' fees and costs, pre/post judgment interest, and such other legal and equitable relief as this Court deems just and proper.

### THIRD CLAIM FOR RELIEF
### New York State Human Rights Law ("NYSHRL")
### N.Y. Exec. L. §§ 290 et seq. – Age Discrimination

95.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

96.     In violation of the NYSHRL, Defendants intentionally and willfully paid Plaintiff less compensation because of his age.

97.     Defendants' conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily protected civil rights.

98.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including past salary, bonuses, and equity opportunities.

99.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to emotional distress, lasting embarrassment, and humiliation.

100.                        As a result of Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages, punitive damages, attorneys' fees and costs,

pre/post judgment interest, and such other legal and equitable relief as this Court deems just and proper.

### FOURTH CLAIM FOR RELIEF
**New York City Human Rights Law ("NYCHRL")**
**N.Y.C. Admin. Code § 8-107 et seq. – Age Discrimination**

101.      Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

102.      In violation of the NYCHRL, Defendants intentionally and willfully paid Plaintiff less compensation because of his age.

103.      Defendants' conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily protected civil rights.

104.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including past salary, bonuses, and equity opportunities.

105.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to emotional distress, lasting embarrassment, and humiliation.

106.      As a result of Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages, punitive damages, attorneys' fees and costs, pre/post judgment interest, and such other legal and equitable relief as this Court deems just and proper.

### FIFTH CLAIM FOR RELIEF
**New York State Human Rights Law ("NYSHRL")**
**N.Y. Exec. L. §§ 290 et seq. – Retaliation**

107.      Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

108.     In violation of the NYSHRL, Defendants intentionally retaliated against Plaintiff by terminating Plaintiff's employment because he complained about alleged sexual harassment and battery of a senior leadership executive.

109.     Defendants' conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily protected rights.

110.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including past and future salary, bonuses, and equity opportunities, and loss of employment benefits.

111.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer, substantial non-monetary damages, including but not limited to emotional distress, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

112.     As a result of Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages, punitive damages, attorneys' fees and costs, pre/post judgment interest, and such other legal and equitable relief as this Court deems just and proper.

## SIXTH CLAIM FOR RELIEF
### New York City Human Rights Law ("NYCHRL")
### N.Y.C. Admin. Code § 8-107 et seq. – Retaliation

113.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

114.     In violation of the NYCHRL, Defendants intentionally retaliated against Plaintiff by terminating Plaintiff's employment because he complained about alleged sexual harassment and battery of a senior leadership executive.

115.     Defendants' conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily protected rights.

116.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including past and future salary, bonuses, and equity opportunities, and loss of employment benefits.

117.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer, substantial non-monetary damages, including but not limited to emotional distress, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

118.     As a result of Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages, punitive damages, attorneys' fees and costs, pre/post judgment interest, and such other legal and equitable relief as this Court deems just and proper.

## SEVENTH CLAIM FOR RELIEF
### New York Labor Law ("NYLL") § 740 – Retaliation

119.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

120.     In violation of the NYLL, Defendants intentionally retaliated against Plaintiff by terminating Plaintiff's employment because he disclosed to his supervisor an activity he reasonably believed violated a law, rule or regulation – the sexual harassment and battery of a senior executive.

121.     Defendants' conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily protected rights.

122.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including past and future salary, bonuses, and equity opportunities, and loss of employment benefits.

123.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer, substantial non-monetary damages, including but not limited to emotional distress, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

124.    As a result of Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages, punitive damages, attorneys' fees and costs, pre/post judgment interest, and such other legal and equitable relief as this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

(A)    For compensatory, liquidated and punitive damages in an amount to be determined by the trier of fact;

(B)    For reasonable attorneys' fees, interest, and costs of suit;

(C)    For pre/post judgment interest;

(D)    For such other and further relief as the Court may deem just and equitable.

Dated: New York, New York      Respectfully submitted,
      October 17, 2023        JOSEPH & KIRSCHENBAUM LLP

                                        By:  __*s/Maimon Kirschenbaum*_____
                                            D. Maimon Kirschenbaum
                                          Michael DiGiulio
                                          32 Broadway, Suite 601
                                          New York, NY 10004
                                          Tel: (212) 688-5640
                                          Fax: (212) 688-2548

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which they have a right to jury trial.